CHRISTOPHER L. WANGER (Bar No. CA 164751)
Email: cwanger@manatt.com
JAKE KIM (Bar No. CA 357950)
Email: cjakim@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
Telephone: (415) 291-7400
Facsimile: (415) 291-7474

Attorneys for Plaintiff,
ACTIVETHEORY LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVETHEORY LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL MODENA, an individual,<br><br>Defendant. | Civil Case No. 8:26-cv-00913<br><br>**COMPLAINT FOR:**<br><br>**BREACH OF CONTRACT; BREACH OF FIDUCIARY DUTY; FRAUD; AND MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRET ACT, 18 U.S.C. § 1836, ET SEQ. AND CALIFORNIA UNIFORM TRADE SECRET ACT, CAL. CIV. CODE § 3246, ET SEQ.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, ACTIVETHEORY LLC ("Activetheory" or the "Company"), hereby complains against Defendant, MICHAEL MODENA ("Modena"), and alleges as follows:

**SUMMARY OF ACTION**

1. Activetheory brings this action to compel specific performance of contractual obligations and to recover for the breaches of contract, fraud, breaches of fiduciary duty and misappropriation of trade secrets in violation of the Defend Trade Secret Act (18 U.S.C. §1836, *et seq*.) and California Uniform Trade Secret Act (Cal. Civ. Code §3246, et seq.) committed by Modena, a former founder and officer of Activetheory. As a founder and officer, Modena owed

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

fiduciary duties to the Company and was contractually obligated to devote his full time to the Company in exchange for substantial compensation. Modena repeatedly breached his duties and contractual obligations to the Company by devoting much of his time and energy to other companies started and run by him.

2.     When Activetheory first discovered that Modena had opened, was operating and was devoting much of his time to another business, the Company confronted Modena and obtained his representation and written agreement in 2023 that he would stop all work and activity outside of Activetheory. But the Company discovered in 2025 that Modena's representations were false and that Modena had no intention of devoting his full time to Activetheory. Instead, Modena had opened another business and was devoting substantial time and energy to that business. In addition, Modena stole the proprietary source code to the software tools developed by Activetheory and used that code to develop a website for his other enterprise. Accordingly, when the Activetheory learned of Modena's misconduct, the Company fired Modena for cause in 2025.

3.     In response, in or around February 2026, Modena opened a second business to compete directly with Activetheory and again used the source code developed by Activetheory to compete against the Company. Modena also repeatedly failed to honor Activetheory's right to redeem his interest in the Company.

4.     By this action, Activetheory seeks to (1) compel Modena to honor and to specifically perform the redemption obligations in his contract with Activetheory; (2) recover for the substantial damages caused by Modena's contract breaches, fraud, breaches of fiduciary duty and trade secret misappropriation; and (3) to obtain preliminary and permanent injunctive relief against Modena to prevent further misappropriation of Activetheory's trade secrets.

**PARTIES**

5.     Plaintiff, Activetheory, is a California limited liability company with its principal place of business in Los Angeles, California. Activetheory is qualified to conduct business in California.

6.     Defendant, Modena, is an individual who Activetheory is informed and believes resides in Yorba Linda, California.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

COMPLAINT

**JURISDICTION AND VENUE**

7.　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the trade secret laws of the United States (18 U.S.C. §§ 1836 and 1839). This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative fact.

8.　Personal jurisdiction exists over Modena because he resides in and has committed acts of trade secret misappropriation in this District.

9.　Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Moreover, Modena committed acts of trade secret misappropriation and resides in this judicial district.

**INTRADISTRICT ASSIGNMENT**

10.　Assignment of this action to the Southern Division of this Court is appropriate because Modena resides in Orange County and a substantial part of the events and omissions giving rise to the claims occurred in this district.

**BACKGROUND FACTS**

**Activetheory, Its Operating Agreement and Modena's Agreement to Devote His Full Time to Activetheory.**

11.　Activetheory was founded by Nick Mountford, Michael Modena and Andy Thelander in or around August 2012. Activetheory builds award-winning immersive digital experiences, including websites, digital installations and games, for some of the world's top brands. Activetheory has developed an industry-leading software toolset known as "Hydra" discussed further below that allows it to provide its customers with dynamic real-time experiences that blend real-time 3D graphics and other technology that drive user engagement.

12.　On November 10, 2017, Activetheory and its founding members, Mountford, Modena and Thelander, executed an Amended and Restated Limited Liability Company Operating Agreement governing the Company and its Operations (the "Operating Agreement"). A copy of the Operating Agreement is attached hereto as **Exhibit 1**. Modena is identified in the Operating

Manatt, Phelps & Phillips, LLP
Attorneys At Law
San Francisco

3

Agreement as a Founding Member. (See Operating Agreement, Section 1.1.)

13.　At the time the Operating Agreement was executed in November 2017, each of Mountford, Modena and Thelander owned 33,333.33 Units of the Company giving each a 33.3% ownership interest in the Company. (See Operating Agreement, Schedule I.)

14.　At all times between 2017 and August 2025, Modena served as an officer of Activetheory. Specifically Modena was the Company's Interactive Director. (See Operating Agreement, Section 7.5(b).) As an officer and employee of Activetheory, Modena owed undivided loyalties to the Company. *See e.g., Techno Lite, Inc. v. Emcod, LLC* (2020) 44 Cal.App.5th 462, 470-474.

15.　At all times between 2017 and August 2025, Activetheory paid Modena substantial compensation for his services to the Company. In exchange for such compensation, Activetheory reasonably required Modena to devote all of his working time exclusively to the Company. The Operating Agreement expressly addresses this obligation in Section 7.9, which provides as follows:

Devotion of Time. Each Founding Member's services for the Company shall be full time and exclusive, and each Founding Member shall devote all of such Founding Member's skill and ability to promote the business and interests of the Company, and to carry out such Founding Member's duties in a competent, faithful, and diligent manner. No Founding Member shall engage in (i) any other business, whether or not pursued for profit, gain or pecuniary advantage, or (ii) any activity which would interfere with or limit in any way the performance and fulfillment of such Founding Member's duties and obligations to the Company. Notwithstanding the foregoing, each Founding Member shall be permitted to engage in charitable activities and manage his personal passive investments, so long as such passive investments are not in a company which transacts business with the Company or engages in business competitive with that conducted by the Company (other than a publicly held corporation in which such Founding Member owns less than 1% of its outstanding shares), and further provided that such activities (individually or collectively) do not materially interfere with the performance of such Founding Member's duties and responsibilities to the Company. For the avoidance of doubt, no Founding Member shall,

4

directly or indirectly, other than through the Company, engage in any business then conducted by the Company (or any activity which is related to or in competition with the business then conducted by the Company).

16.    The obligations imposed on Modena by Section 7.9 are reasonable, valid and enforceable in light of Modena's role in and responsibilities at Activetheory and the substantial compensation the Company paid to him for his undivided loyalty. The obligations are not invalid under California Business & Professions Code under section 16600 or otherwise because they do not impose any post-employment limitation on Modena. Instead, they merely required Modena to devote his time and skills exclusively to Activetheory so long as he was a Founding Member of the Company.

**Activetheory's Hydra Software**

17.    As noted above, Activetheory employs in its business certain proprietary software and related code known as "Hydra". Hydra is a proprietary, high-performance 3D engine and web-technology-based development framework built by Activetheory. While many of Activetheory's competitors rely on open-source libraries like Three.js, Activetheory developed Hydra specifically to overcome the performance bottlenecks and "overhead" associated with general-purpose web tools. Originally written in JavaScript to leverage the ubiquity of WebGL and WebGL2, the framework can be deployed alongside Aura (a proprietary Hydra module), a JavaScript module that bridges to C++/C layers. This combination allows the JavaScript-based engine to interface directly with hardware on iOS, Android, and Desktop, achieving rendering speeds up to 3 times faster than standard browser-based environments.

18.    Beyond its 3D engine, Hydra can be used to build entire website solutions with its local development server and "build" tooling, which optimizes code prior to shipping a product live to production. The majority of Hydra's code exists in a library of tools and modules to empower developers to build entire web solutions quickly. Activetheory has developed over 332 modules within Hydra (that only run within the framework), which enable Activetheory's developers to quickly leverage pre-built technology from past projects or experimentations into their work. These modules range from utilities like GPU detection, to special effects like "mouse fluid", which gives

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

a liquid visual effect that follows the user's mouse cursor across the screen and provides the website with a premium feel.

19.     Activetheory has invested substantial time and resources in the development of the Hydra source code over the span of approximately fourteen years during which Activetheory has continuously optimized the software. The Hydra source code is maintained and evolved by a core technical team of roughly 5 to 15 senior developers, who have integrated advanced features such as WebWorker-based parallelization to ensure complex 3D scenes run without taxing a user's CPU.

20.     Hydra and its secret source code provide Activetheory with a competitive advantage in its business, including the following:

**Designer-Centric Workflow**: The Hydra GUI (UIL) allows artists to build and light entire 3D scenes in a "no-code" environment with real-time Firebase synchronization. This allows Activetheory to iterate on visual quality much faster than competitors who must rely on manual code updates.

**High-End Performance**: By removing the "security checks" and compositing layers typical of standard browsers, Hydra enables "AAA" graphics quality on lower-powered devices, avoiding the common issue of overheating or "fan noise" during 3D web experiences.

**Proven Scalability**: Hydra is the foundational technology for Dreamwave, Activetheory's virtual event platform, which has successfully hosted hundreds of thousands of concurrent users in immersive 3D environments for global brands like Google, Spotify, and Sundance.

21.     The source code to Hydra developed by Activetheory is maintained and qualifies as a trade secret of Activetheory under the Defend Trade Secret Act (18 U.S.C. §1836, *et seq*.) and California's Uniform Trade Secrets Act (Civil Code § 3426 et seq.). Although some of the code used in Hydra is open source code, much of the code was independently developed by Activetheory and belongs exclusively to the Company.

22.     Activetheory has consistently maintained the confidentiality of its proprietary Hydra source code and limited access to and disclosure of the code to those bound by confidentiality obligations. The Hydra source code developed by Activetheory is unique and not generally known

6

in the industry and, as such, is valuable to its competitors.

23.    Activetheory has acted reasonably and diligently to protect the secrecy of the Hydra source code that it developed, including but not limited to, through the following measures:

- Securing access to its offices;

- Requiring employees and contractors to sign non-disclosure / confidentiality agreements prior to obtaining access to Hydra source code;

- Delivering the Hydra code to customers in object code form and requiring customers to sign license agreements acknowledging that the Hydra software is proprietary to Activetheory;

- Storing the source code on secure, password-protected servers to which only Activetheory's developers have access;

- Performing exit interviews in which Activetheory's developers discuss the continuing nature of their duties of confidentiality to Activetheory, as well as detailed questions about return of company documents, diligently seeking return of its property including its trade secret and confidential information; and

- Requiring that employees reaffirm their confidentiality, non-disclosure, employee non-solicitation and return of property obligations upon termination of employment.

24.    Modena was involved in the development of Hydra and its source code. From his years with Activetheory, Modena had access to and retained copies of Hydra and its source code. Modena acknowledged and agreed in Section 9.3 of the Operating Agreement that all software developed by him individually or in collaboration with others related to the Company's business, including Hydra, was and is Activetheory's property. Modena also agreed under Section 9.3 of the Operating Agreement to deliver Hydra and all other Company Property to Activetheory upon his termination.

**Modena's Initial Failure to Honor His Agreement to Devote His Full Time to Activetheory.**

25.    Activetheory learned that Modena was in breach of Section 7.9 of the Operating Agreement and was not devoting his full time exclusively to Activetheory. Specifically, Activetheory discovered that Modena was running and devoting substantial time to a car wrapping

7

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

business known as "Driver Aesthetic". In response to this discovery, Activetheory's other Founding Members, Mountford and Thelander, confronted Modena in 2023 about his work outside of Activetheory for Driver Aesthetic and required Modena to represent and agree in writing in a document entitled "Partners' Resolution Agreement" dated July 27, 2023 that Modena was "no longer active in a business outside of Active Theory." Based on this representation and agreement, Activetheory agreed, subject to certain terms, not to seek to recover from Modena compensation paid to him by the Company for his full time devotion to Activetheory even though Modena was devoting substantial time to another business in breach of Section 7.9 of the Operating Agreement.

26.    Activetheory and its founders, Mountford and Thelander, reasonably relied on Modena's representations in the Partners' Resolution Agreement that he was no longer active in a business outside of Activetheory and were induced by that agreement to forbear from taking action in 2023 against Modena for his failure to devote his full time to Activetheory as provided for in the Operating Agreement. It only later became clear that Modena's representations in the Partners' Resolution Agreement were false and that Modena had no intention of complying with the terms of Operating Agreement or the Partners' Resolution Agreement or devoting all of his time to Activetheory.

27.    If Activetheory had known Modena's true intentions in 2023, it would have sought relief against Modena in 2023 for his breach of section 7.9 of the Operating Agreement, including by, among other things, seeking to claw back the compensation Activetheory paid to Modena while he worked for another company and/or seeking a restitutionary award of the compensation he earned from the other company while he was contractually obligated to work full time for Activetheory.

**The Company's Redemption of Thelander's Units**

28.    In or around January 2025, Thelander voluntarily terminated his services for the Company. The Operating Agreement provides that in the event that a Founding Member's services for the Company terminate, the Company has the option to redeem the Founding Member's Units and establishes the purchase price for such redemption (the "Redemption Price"). (See Operating Agreement, Article VIII.) Activetheory exercised its option to redeem all of Thelander's Units in

the Company in January 2025.

29.     Under the Operating Agreement, the Redemption Price to be paid to a Founding Member depends upon, among other things, whether the Founding Member's services were terminated by the Company for "Cause". Because Thelander voluntarily terminated his services with Activetheory and his services with the Company were not terminated for Cause, the Redemption Price for Thelander's Units was governed by Section 8.2(b) of the Operating Agreement and included both a "Net Asset Value Payment" and a "Formula Price", as those terms are used in the Operating Agreement.

30.     Activetheory is in the process of completing the redemption of Thelander's Units in the Company pursuant to the express terms of the Operating Agreement. In connection with the redemption, Thelander executed (1) an assignment to evidence the transfer of his Units to Activetheory free and clear of any liens, claims or other encumbrances as required by Section 8.4(a) the Operating Agreement; and (2) a full release of any and all claims he may have had against Activetheory and its members as required by Section 8.6 of the Operating Agreement. Pursuant to Section 8.6 of the Operating Agreement, Activetheory's obligation to pay Thelander the full Redemption Price is subject to his abiding by the provisions of Article IX[1] of the Operating Agreement.

**Activetheory Discovers Modena's New Breaches of Duty and Contract and His Fraud and Misappropriation of Trade Secrets.**

31.     In or around June 2025, Activetheory discovered that Modena was continuing to operate and devote substantial time to another business. Specifically, Activetheory discovered that Modena was running another car wrapping business know as Aura Premium Vinyl LLC ("Aura Vinyl"). According to records of the California Secretary of State, Modena formed Aura Vinyl in May 2023.

32.     At all times between July 2023 and June 2025, Modena concealed from

---

[1] Section 8.6 of the Operating Agreement refers to "Article X" but Activetheory contends that is a typographical error. The context of the agreement makes clear that Section 8.6 intended to refer to "Article IX" (the article that addresses the Protective Covenants by which Members are bound) rather than "Article X" (the article that addresses the Company's obligation to maintain books and records).

COMPLAINT

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Activetheory that he was not devoting his full business time and attention to the Company and instead was running Aura Vinyl. Modena did so after expressly representing to Activetheory and its other Founding Members in the Partners' Resolution Agreement signed by Modena in July 2023 that he was no longer active in another business.

33.     Modena's work for Aura Vinyl materially detracted attention from his work for Activetheory, for which Modena was handsomely compensated. Modena devoted so much time and effort to Aura Vinyl that he was too burnt-out to work for Activetheory notwithstanding the generous compensation he received from Activetheory. As a result of such disloyalty and time diversions, Modena was paid by Activetheory compensation to which he was not entitled.  Modena also earned compensation at Aura Vinyl that he should be required to disgorge for Activetheory's benefit.

34.     Activetheory also first discovered in or around August 2025 that Modena had used Activetheory's Hydra software source code to develop the website for Aura Vinyl (explore.auravinyl.com). In August 2025, Activetheory provided notice to Modena of his unauthorized use of Hydra on the Aura Vinyl website and demanded that he cease his unauthorized use of Hydra. Activetheory also demanded that Modena maintain copies of all prior versions of the Aura Vinyl website.

35.     Both before and after that notice, Modena attempted to conceal his continuing use of Hydra and its source code by scrubbing references to Hydra on the Aura Vinyl website. Despite Modena's efforts to conceal his infringement and misappropriation of Activetheory's intellectual property, substantial evidence remained that the website was built with and used the Hydra software code.

36.     Section 7.4(b) of the Operating Agreement confirms that Modena could be terminated for Cause "upon the vote of the other Founding Members." In light of Modena's misconduct, Activetheory's sole other Founding Member, Mountford, voted to terminate Modena for Cause in August 2025.

37.     On August 14, 2025, Mountford, on behalf of Activetheory, provided written notice to Modena of his termination for Cause based on his failure to devote his full business time and

10

COMPLAINT

attention to the Company, his willful acts of fraud and dishonesty and his misappropriation of Activetheory's intellectual property.

38.     Section 1.1 of the Operating Agreement defines "Cause" as follows:

"Cause" means with respect to any Founding Member: (a) such Founding Member's failure or refusal to devote such Founding Member's full business time and attention to the Company (other than a temporary absence due to sickness or injury) in accordance with Section 7.9, if such failure or refusal is not cured (if curable) within 30 days after written notice thereof from the Company; (b) such Founding Member's willful act of fraud or material dishonesty, including, without limitation, misappropriation of funds or property of the Company; (c) such Founding Member's use of alcohol or illicit use of drugs, materially interfering with the performance of his duties and responsibilities to the Company, which continues after written warning; (d) such Founding Member's conviction of any felony, or any crime involving fraud, material dishonesty, moral turpitude or any securities law violation; (e) significant violation of any Company policy, including, without limitation, policies against racial or sexual discrimination or harassment; (f) conduct by such Founding Member that is intended or reasonably likely to materially injure the reputation, business or business relationships of the Company, other than any act which the Founding Member reasonably believes to be in the best interest of the Company; (g) breach of any protective covenant contained in Article IX; or (h) any material breach of this Agreement (not covered by any of the foregoing clauses (a) through (g)) which breach is not cured (if curable) within 30 days after written notice thereof from the Company. The Company may effect a termination for Cause of a Founding Member by delivery of a written notice from the Founding Members (other than the Founding Member that is the subject of the termination) setting forth in reasonable detail the basis for the termination.

39.     Modena was subject to termination for "Cause" as that term is used in the Operating Agreement for multiple reasons. For years, Modena concealed from Activetheory that he was not devoting his full business time and attention to the Company and instead was running a separate business. Modena did so after Activetheory provided notice to him in 2023 that his work outside

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

of Activetheory breached the Operating Agreement and after he expressly misrepresented in the 2023 Partners' Resolutions Agreement that he would no longer be active in an outside business. Modena also misappropriated the Company's software and used it for Aura Vinyl. A review of the Aura Vinyl website confirmed that it used the Hydra source code developed by Activetheory. Modena's attempts to scrub the Aura Vinyl site to delete the references to Hydra were further evidence of his deceit.

40.    Modena's 2025 breaches of the Operating Agreement were not cured or curable for numerous reasons, including but not limited to those below. First, Activetheory had provided Modena with notice in 2023 that he was in breach of his obligation under Section 7.9 of the Operating Agreement to devote his full business time and attention to Activetheory by working outside of the Company. Despite this notice, Modena failed to cure his breach and subsequently continued to work outside the Company. Second, Modena's conduct constituted (1) "willful acts of fraud and material dishonesty" and "misappropriation of … property of the Company"; (2) conduct that was "reasonably likely to materially injure the reputation, business or business relationships of the Company"; and (3) a "breach of [a] protective covenant contained in Article IX" of the Operating Agreement, all of which conduct was neither subject to cure nor cured by Modena. As a result, no further notice from Activetheory to Modena of his many failings was required prior to his termination.

**Modena Repeatedly Breaches the Redemption Provisions of the Operating Agreement.**

41.    On August 27, 2025, Activetheory provided Modena with written Notice of the Company's exercise of its option to redeem his Units in the Company as provided for in Sections 8.1, 8.4(a), 8.4(b)(i) and 8.6 of the Operating Agreement. Because Activetheory properly terminated Modena for Cause, the applicable Redemption Price for his Units was limited to the "Net Asset Value Payment" pursuant to Section 8.2(a) of the Operating Agreement. Net Asset Value Payment is defined in Section 8.3(d) of the Operating Agreement to mean:

"(i) the Ownership Percentage  represented by the Units being redeemed, *multiplied by* (ii)

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the Net Asset Value of the Company on the last day of Y-1[2] minus the aggregate amount of any distributions paid during Y-1 or Y in respect of Y-1 to the Founding Member whose units are being redeemed."

"Net Asset Value" is defined in Section 8.3(c) of the Operating Agreement as "the tangible assets minus the liabilities of the Company as determined by the Company's accountants." Modena was required to execute (1) an assignment to evidence the transfer of his Units to the Company free and clear of any liens, claims or other encumbrances under Section 8.4(a) the Agreement; and (2) a full release of any and all claims he may have against the Company and its members under Section 8.6 of the Agreement. Activetheory's obligation to pay Modena the Redemption Price, *i.e.* the Net Asset Value Payment, is subject to his abiding by the provisions of Article IX of the Agreement under Section 8.6 of the Agreement.

42.     Modena subsequently failed and refused to comply with Activetheory's August 27, 2025 Redemption Notice and breached his obligation to honor Activetheory's redemption rights without justification.

43.     On February 3, 2026, Activetheory provided Modena with a second written Notice of the Company's exercise of its option to redeem his Units in the Company. Activetheory's accountants determined that the tangible assets minus the liabilities of the Company (the Net Asset Value) for the 2025 fiscal year totaled $1,555,412. After deducting draws paid to Modena in 2025 and applying his 50% ownership interest, the Net Asset Value Payment due to Modena totaled $650,206. Without justification, Modena again failed and refused to comply with his redemption obligations and failed and refused to allow the Company to redeem his Units in the Company.

44.     Activetheory has recently discovered that, in addition to his use of Activetheory's proprietary Hydra source code on the Aura Vinyl website, Modena is also using Activetheory's proprietary Hydra source code on the website for his new competing business, Forged Creative LLC ("Forged"). Based on Modena's unauthorized use of Hydra in the Aura Vinyl and Forged websites, Activetheory believes Mr. Modena has used or intends to use Activetheory's proprietary

---

[2] "Y" is defined in Section 8.3(a) of the Operating Agreement as the fiscal year in which the Redemption Notice is delivered, and "Y-1" is defined as the immediately preceding fiscal year.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

Hydra code in other aspects of Forged's business, including in demonstrations to potential customers and implementations for actual customers.

<u>**COUNT I**</u>

**Breach of Written Contract**

45.     Activetheory realleges and incorporates by reference the allegations of paragraphs 1 through 44 as set forth above.

46.     Activetheory and Modena are parties to the Operating Agreement.

47.     Activetheory has performed or tendered performance of all conditions, covenants, and promises to be performed by it under the Operating Agreement, except those covenants that were either waived by Modena or excused or otherwise discharged by reason of Modena's conduct or those which Activetheory was prevented from performing through no fault of Activetheory.

48.     Within the last four years, Modena has breached the Operating Agreement in multiple ways, including by (1) failing and refusing to devote his full time and skills exclusively to Activetheory and by devoting substantial time to founding and operating Aura Vinyl; (2) using Activetheory's Confidential Information and Company Property, including Hydra source code, for his own personal benefit in violation of Section 9.2 of the Operating Agreement; and (3) failing to honor Activetheory's redemption notices and failing and refusing to allow Activetheory to redeem his Units in the Company on the terms set forth in Article VIII the Operating Agreement.

49.     As a result of Modena's breaches, Activetheory has incurred damages. Modena's breaches of the Agreement were substantial factors in causing harm to Activetheory.

50.     Activetheory's damages are a foreseeable and proximate result of Modena's breaches of the Operating Agreement. Modena had actual knowledge that his breaches would interfere with Activetheory's ability to receive the bargained-for benefits of the Operating Agreement and would damage Activetheory.

51.     Activetheory has been damaged in amount subject to proof at trial. Activetheory will continue to be damaged unless Modena is compelled to fully perform under the Operating Agreement.

52.     Activetheory has no adequate remedy at law for Modena's failure to comply with

his redemption obligations under the Operating Agreement. Activetheory will suffer irreparable harm to the extent Modena is not required to specifically perform and Activetheory is prevented from redeeming Modena's Units in Activetheory. Modena's refusal to comply with his redemption obligations places a cloud over the ownership of Activetheory, reduces the Company's value and makes it less attractive to a potential acquiror.

53.     The redemption obligations in Article VIII of the Operating Agreement are sufficiently certain in their terms to be specifically enforced, including but not limited to Modena's obligation to (1) accept a total Net Asset Value Payment of $650,206 for the redemption of his Units in Activetheory; (2) execute an assignment to evidence the transfer of his Units to Activetheory free and clear of any liens, claims or other encumbrances as required by Section 8.4(a) the Operating Agreement; (3) execute a full release of any and all claims he may have had against Activetheory and its members as required by Section 8.6 of the Operating Agreement; and (4) abide by the provisions of Article IX of the Operating Agreement.

## <u>COUNT II</u>
### Breach of Fiduciary Duty

54.     Activetheory realleges and incorporates by reference the allegations of paragraphs 1 through 44 as set forth above.

55.     At all relevant times Modena served as a Founding Member and officer of Activetheory. As an officer and Founding Member of Activetheory, Modena owed to Activetheory the duty to protect Activetheory's interests and to refrain from doing anything that would cause injury to the company.

56.     Modena failed not only to affirmatively protect the interests of Activetheory but also engaged in acts that Modena knew would cause injury to the Company. Specifically, Modena (1) failed and refused to devote all of his time and services to Activetheory and instead devoted so much time and effort to his outside ventures that he was too burnt-out to work for Activetheory; and (2) used Activetheory's Confidential Information and Company Property, including the source code for Hydra, for his own personal benefit. In doing so, Modena did not act in good faith or in any reasonable belief that his conduct represented good business judgment or was in the best

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

interests of Activetheory. Rather, Modena's actions were undertaken in bad faith and intended solely to further his private interests and breached his fiduciary duty to maintain and defend the interests of Activetheory.

57. Because of the willful, fraudulent, oppressive and malicious nature of Modena's wrongful acts, Activetheory is entitled to an award of punitive damages against Modena.

**COUNT III**
**Promissory Fraud**

58. Activetheory realleges and incorporates by reference the allegations of paragraphs 1 through 44 as set forth above.

59. When Modena entered into the Partners' Resolution Agreement, he represented and promised that he was no longer active and would not be active in any business outside of Activetheory. At the time Modena made that promise, he had no intention of performing it. Modena made his promises in the Partners' Resolution Agreement to induce Activetheory to refrain from seeking to recover from him compensation paid to Modena to which he was not entitled for services he had not provided.

60. At the time that Modena made his promises and representations in the Partners' Resolution Agreement regarding his activities outside of Activetheory, Activetheory was ignorant of Modena's secret intention to continue to work outside of Activetheory and Activetheory could not, in the exercise of reasonable diligence, have discovered Modena's secret intention. In reliance on Modena's promises in the Partners' Resolution Agreement, Activetheory continued to employ Modena and to pay him significant compensation. If Activetheory had known Modena's actual intention, Activetheory would not have continued to employ Modena and to pay him the significant compensation that it did.

61. Modena failed to abide by the promises in the Partners' Resolution Agreement and instead continued to devote much of his time and effort to another business. Activetheory only learned in July 2025 that Modena had no intention of keeping his promise not to work outside of Activetheory when it discovered his role at, and work for, Aura Vinyl.

62. In executing the Partners' Resolution Agreement, Modena acted with the intent to

16

COMPLAINT

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

deceive and defraud Activetheory, and to induce Activetheory to continue to pay him substantial compensation for his exclusive service to the Company notwithstanding his devotion of substantial time and effort to Aura Vinyl. As a proximate result of the conduct alleged herein, Activetheory has been damaged in an amount to be proven at trial but, in any event, an amount in excess of the jurisdictional minimum of the Court.

63. In doing the foregoing acts, Modena is guilty of malice, oppression, and fraud, in that he intended to cause injury to Activetheory and/or consciously disregarded the Company's rights, subjected Activetheory to unjust hardship in conscious disregard of its rights, and intentionally misrepresented and concealed facts with the intention of depriving Activetheory of its rights and otherwise causing Activetheory injury. Activetheory therefore is entitled to recover exemplary damages from Modena according to proof.

## COUNT IV

**Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b) and 1839 *et seq.***

64. Activetheory realleges and incorporates by reference the allegations of paragraphs 1 through 44 as set forth above.

65. The source code to Hydra developed by Activetheory is a trade secret and confidential information used by Activetheory in products and services sold by it across the country and throughout the world.

66. Activetheory is the owner of the Hydra source code developed by it and such source code constitutes "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

67. The Hydra source code developed by Activetheory that Modena accessed, used and copied derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Activetheory's competitors, including Forged, or by other persons or entities who might obtain economic value from its disclosure or use.

68. At all times relevant herein, Activetheory has taken reasonable measures to protect the secrecy of its trade secret and confidential information in the Hydra source code that it

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

developed, including that which Modena has misappropriated.

69.     Modena gained access to the Hydra source code through his work at Activetheory but had an obligation to maintain the confidentiality of the source code and not to use it for his personal benefit.

70.     Modena wrongfully used the Hydra source code developed by Activetheory at Aura Vinyl and Forged for Modena's personal benefit.

71.     Modena's actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

72.     Modena knew or should have known that he had no right to use at Aura Vinyl or Forged the Hydra source code that Activetheory developed.

73.     Activetheory did not begin to discover, nor could it, through the exercise of reasonable diligence have discovered, Modena's misappropriation before June 2025.

74.     Activetheory is informed and believes that Modena has retained and is using Activetheory's trade secret source code and confidential information to compete with and/or otherwise harm Activetheory. As alleged herein, Modena committed numerous acts in furtherance of its misappropriation in the United States and in this District with knowledge and intent to harm Activetheory and to benefit from his theft.

75.     Modena's misappropriation has proximately caused damage to Activetheory, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

76.     Modena has been unjustly enriched as a further proximate result of his misappropriation of Activetheory's trade secret source code and confidential information

77.     Modena's actions in misappropriating Activetheory's trade secret source code and confidential information were willful, fraudulent, malicious, and were done with the intent to injure and oppress Activetheory and improve Modena's own economic opportunities, thereby justifying an award of punitive damages against Modena pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

78.     Modena agreed in Section 9.5 of the Operating Agreement that any breach or

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

COMPLAINT

threatened breach of Article IX would result in irreparable injury to Activetheory for which it would have no meaningful remedy at law and Activetheory shall be entitled to injunctive relief to enforce Article IX, including Modena's obligations to maintain the confidentiality of the Activetheory developed source code to Hydra and not to use such Company property for his personal benefit. Activetheory is entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential information and trade secret source code by (1) enjoining Modena from using or disclosing Activetheory's trade secret source code and confidential information; (2) enjoining Modena from altering or deleting Activetheory's trade secret source code and confidential information; and (3) requiring Modena to turn over any and all copies of Activetheory's trade secret source code and confidential information to Activetheory.

## COUNT V

### Trade Secret Misappropriation Under The California Uniform

### Trade Secret Act, Cal. Civ. Code § 3426 et seq.

79. Activetheory realleges and incorporates by reference the allegations of paragraphs 1 through 44 as set forth above.

80. The source code to Hydra developed by Activetheory constitutes "trade secrets" within the meaning of Cal. Civil Code § 3426.1.

81. The Hydra source code developed by Activetheory that Modena accessed, used and copied derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Activetheory's competitors, including Forged, or by other persons or entities who might obtain economic value from its disclosure or use.

82. At all times relevant herein, Activetheory has taken reasonable measures to protect the secrecy of its trade secret and confidential information in the Hydra source code that it developed, including that which Modena has misappropriated.

83. Modena gained access to the Hydra source code developed by Activetheory through his work at Activetheory but had an obligation to maintain the confidentiality of the source code and not to use it for his personal benefit.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

COMPLAINT

84. Modena wrongfully used the Hydra source code developed by Activetheory at Aura Vinyl and Forged for Modena's personal benefit.

85. Modena's actions, as set forth herein, constitute "misappropriation" within the meaning of Cal. Civil Code § 3426.1.

86. Modena knew or should have known that he had no right to use the Hydra source code at Aura Vinyl or Forged.

87. Activetheory did not begin to discover, nor could it, through the exercise of reasonable diligence have discovered, Modena's misappropriation before June 2025.

88. Activetheory is informed and believes that Modena has retained and is using Activetheory's trade secret source code and confidential information to compete with and/or otherwise harm Activetheory. As alleged herein, Modena committed numerous acts in furtherance of its misappropriation in California with knowledge and intent to harm Activetheory and to benefit from his theft.

89. Modena's misappropriation has proximately caused damage to Activetheory, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

90. Modena has been unjustly enriched as a further proximate result of his misappropriation of Activetheory's trade secret source code and confidential information

91. Modena's actions in misappropriating Activetheory's trade secret source code and confidential information were willful, fraudulent, malicious, and were done with the intent to injure and oppress Activetheory and improve Modena's own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to Cal. Civil Code section 3426.3(c) and attorneys' fees pursuant to Cal. Civ. Code § 3426.4.

92. Modena agreed in Section 9.5 of the Operating Agreement that any breach or threatened breach of Article IX would result in irreparable injury to Activetheory for which it would have no meaningful remedy at law and Activetheory shall be entitled to injunctive relief to enforce Article IX, including Modena's obligations to maintain the confidentiality of the Activetheory developed source code to Hydra and not to use such Company property for his personal benefit.

20

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Activetheory is entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential information and trade secret source code by (1) enjoining Modena from using or disclosing Activetheory's trade secret source code and confidential information; (2) enjoining Modena from altering or deleting Activetheory's trade secret source code and confidential information; and (3) requiring Modena to turn over any and all copies of Activetheory's trade secret source code and confidential information to Activetheory.

## PRAYER FOR RELIEF

WHEREFORE, Activetheory prays for judgment against Modena as follows:

1.　For judgment in Activetheory's favor and against Modena on all counts alleged herein;

2.　For actual damages for breach of contract, breach of fiduciary duty and fraud in an amount to be proven at trial;

3.　For exemplary damages for Modena's breaches of fiduciary duty and fraud;

4.　For disgorgement of profits and restitution;

5.　For specific performance of all of Modena's redemption obligations in Article VIII of the Operating including (1) acceptance by Modena of a total Net Asset Value Payment of $650,206 for the redemption of his Units in Activetheory; (2) execution by Modena of an assignment to evidence the transfer of his Units to Activetheory free and clear of any liens, claims or other encumbrances as required by Section 8.4(a) the Operating Agreement; (3) execution by Modena of a full release of any and all claims he may have against Activetheory and its members as required by Section 8.6 of the Operating Agreement; and (4) Modena's abidance by the provisions of Article IX of the Operating Agreement;

6.　For actual damages for misappropriation of Activetheory's trade secrets under 18 U.S.C. § 1836(b)(3) and Civil Code § 3426.3(a);

7.　For exemplary damages for willful and malicious misappropriation of Activetheory's trade secrets under 18 U.S.C. § 1836(b)(3)(C) and Civil Code § 3426.3(c);

8.　For preliminary and permanent injunctive relief, including an order (1) enjoining and forbidding Modena from using any Hydra source code developed at Activetheory; and (2)

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

requiring Modena to return all copies of Hydra and any source code developed at Activetheory;

9. For attorney's fees and costs of suit incurred herein as provided for by law, including pursuant to 18 U.S.C. § 1836(b)(3)(D) and Civil Code § 3426.4; and

10. For such other further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Activetheory hereby demands a trial by jury on all issues or causes of action triable by jury.

Dated:    April 15, 2026                    MANATT, PHELPS & PHILLIPS, LLP


By: /s/Christopher L. Wanger
    Christopher L. Wanger
    *Attorneys for Plaintiff*
    ACTIVETHEORY LLC

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

COMPLAINT